IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARITZA RODRIGUEZ        :     CIVIL ACTION
                                  :
          v.                 :
                                  :
ANDREW SAUL, Commissioner of    :     NO. 18-1908
Social Security[1]                   :

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                            September 25, 2019

      Maritza Rodriguez ("Plaintiff") seeks review, pursuant to 42 U.S.C. § 405(g), of

the Commissioner's decision denying her claim for disability insurance benefits ("DIB").

For the reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") denying benefits is not supported by substantial evidence and will remand the

case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.     PROCEDURAL HISTORY

      Plaintiff protectively filed her DIB application on October 2, 2014, see tr. at 139-

42, claiming that she became disabled on July 9, 2014, due to type II diabetes with

kidney pain, degenerative macular edema, neuropathy in the hands, arms and legs, and

hypertension. Tr. at 183.[2] The application was denied initially, id. at 83-87, and Plaintiff

---

       [1]Andrew Saul became the Commissioner of Social Security on June 17, 2019, and
should be substituted for the former Acting Commissioner, Nancy Berryhill, as the
defendant in this action. Fed. R. Civ. P. 25(d).

       [2]Plaintiff also filed an application for supplemental security income ("SSI")
benefits in October 2014, see tr. at 143-47, but by the time the matter reached the ALJ,
only the DIB application was at issue. Id. at 15. For DIB eligibility, a claimant must
establish disability on or before his or her date last insured. See 20 C.F.R. § 404.101(a);
Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990). Plaintiff's date last insured for

requested an administrative hearing before an ALJ.  Id. at 88-89.  An administrative

hearing took place on May 3, 2017.  Id. at 35-71.  On May 3, 2017, the ALJ found that

Plaintiff was not disabled.  Id. at 12-29.  The Appeals Council denied Plaintiff's request

for review on October 26, 2017, id. at 1-6, making the ALJ's May 3, 2017 decision the

final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on May 7, 2018.  Docs. 1 & 2.

The matter is now fully briefed and ripe for review.  Docs. 9 & 10.[3]

## II. <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r</u>

<u>of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled and can perform jobs that exist in significant numbers in the

national economy.  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v.</u>

_____

purposes of DIB is either December 31, 2018, <u>tr.</u> at 72, 180, or June 30, 2020.  <u>Id.</u> at 15,
17.

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c), and the Honorable Gerald J. Pappert, to whom the case was assigned, referred it
to me for all further proceedings.  <u>See</u> Doc. 14.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal

issues.  Schaudeck, 181 F.3d at 431.

　　　To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.　　Whether the claimant is currently engaged in
> substantially gainful activity;
>
> 2.　　If not, whether the claimant has a "severe impairment"
> that significantly limits her physical or mental ability to
> perform basic work activities;
>
> 3.　　If so, whether based on the medical evidence, the
> impairment meets or equals the criteria of an impairment
> listed in the listing of impairments ("Listings"), 20 C.F.R. pt.
> 404, subpt. P, app. 1, which results in a presumption of
> disability;
>
> 4.　　If the impairment does not meet or equal the criteria
> for a listed impairment, whether, despite the severe
> impairment, the claimant has the residual functional capacity
> ("RFC") to perform her past work; and
>
> 5.　　If the claimant cannot perform her past work, then the
> final step is to determine whether there is other work in the
> national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the

burden of proof at steps one through four, while the burden shifts to the Commissioner at

the fifth step to establish that the claimant is capable of performing other jobs in the local

and national economies, in light of her age, education, work experience, and RFC. See

Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

Plaintiff was born on November 10, 1962, and thus was fifty-one years of age at

the time of her alleged disability onset date (July 9, 2014), and fifty-four at the time of

the ALJ's decision (May 3, 2017). Tr. at 139, 180. The Disability Report and initial

disability determination indicate a height of five feet, five inches, and a weight of 174

pounds, but these numbers appear to be overestimates. Id. at 72, 183.[4] At the time of her

administrative hearing, Plaintiff lived with her husband. Id. at 46. She has three adult

children who live on their own, plus grandchildren. Id. Plaintiff completed two years of

college and has specialized training as a medical technician. Id. at 184. She has past

relevant work as a nurse aide and store laborer. Id. at 63, 184, 210.

### A.    ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from two severe impairments at the second

step of the sequential evaluation; diabetes mellitus and disorders of the spine. Tr. at 17.

The ALJ next found that Plaintiff did not have an impairment or combination of

impairments that met the Listings, id. at 18, and that she retained the RFC to perform

light work except she can lift twenty pounds occasionally and ten pounds frequently, and

---

[4]For example, medical records from April 2015 indicate a height of five feet, three inches, and a weight of 149 pounds. Tr. at 369. Although Plaintiff did not give her weight at the administrative hearing, she testified that she had lost approximately fifty pounds, which she attributed to diabetes. Id. at 59-60.

can sit, stand, and walk six hours each in an eight-hour day.  Id. at 19.  She could

occasionally use the lower extremities for pushing and pulling or foot controls and

occasionally perform postural maneuvers, must avoid climbing ladders, ropes, scaffolds,

and unprotected heights, and could occasionally use ramps and stairs.  Id.  At the fourth

step of the evaluation, the ALJ found that Plaintiff could return to her past relevant work

as a store laborer.  Id. at 27.  Alternatively, the ALJ found, based on the testimony of a

vocational expert ("VE"), that Plaintiff could perform work that exists in significant

numbers in the national economy including jobs such as small product assembler,

inspector, and garment folder.  Id. at 27-28.  Therefore, the ALJ concluded that Plaintiff

was not under a disability from the application date though the date of the decision.  Id. at

28.

   Plaintiff claims that the ALJ's decision is not supported by substantial evidence

because the ALJ (1) failed to properly consider the medical opinion evidence, (2) failed

to properly consider Plaintiff's subjective complaints, and (3) violated her duty to

develop the record.  Doc. 9 at 12-23.  Defendant responds that the ALJ properly

considered the medical opinions and Plaintiff's subjective complaints and was under no

duty to further develop the record, and that her decision is supported by substantial

evidence.  Doc. 10 at 6-15.

### B.   Summary of Medical Evidence

   On June 4, 2014, Plaintiff was seen at Stauffer Family Practice by Giles Baker,

CRNP, with active problems including dyslipidemia, esophageal reflux ("GERD"),

hypertension, peripheral neuropathy, and Type II diabetes mellitus with ophthalmic

manifestations, uncontrolled.  <u>Tr.</u> at 251.[5]  Plaintiff complained of an increased burning

sensation in her feet, ongoing numbness and tingling, weight loss, headaches, and

insomnia.  <u>Tr.</u> at 250-51.  <u>Id.</u>  Plaintiff exhibited abnormal reflexes, with "0" recorded on

the right and left patella, diminished vibratory sensation and position sense in the toes,

and diminished tactile sensation and monofilament testing throughout both feet.  <u>Id.</u> at

253.  Mr. Baker added a trial of nortiptyline, <u>id.</u> at 250, to Plaintiff's existing

medications, which included glipizide, lisinopril, NovoLog, omeprazole, insulin pens,

and simvastatin.  <u>Id.</u> at 252.[6]

---

[5]Mr. Baker indicated that Plaintiff was last seen at the practice "close to two years ago."  <u>Tr.</u> at 250.  The June 4, 2014 treatment encounter was electronically signed by Mr. Baker and Fan Cheng, M.D.  <u>Id.</u> at 253.

Dyslipidemia is abnormality of lipids and lipoproteins in the blood.  <u>Dorland's Illustrated Medication Dictionary</u>, 32nd ed. 2012 ("<u>DIMD</u>"), at 578.  GERD is any condition that results from gastroesophageal reflex.  <u>Id.</u> at 533.  Peripheral neuropathy (or polyneuropathy) is nerve pain in several peripheral nerves simultaneously.  <u>Id.</u> at 1269, 1491.  Type II diabetes mellitus (or adult-onset diabetes) is an autoimmune disease of the pancreas.  <u>Id.</u> at 506.

[6]Nortriptyline is a tricyclic antidepressant.  <u>See</u> http://www.drugs.com/nortriptyline.html (last visited Sept. 12, 2019).  Glipizide is an oral diabetes medication that helps control blood sugar levels by helping the pancreas produce insulin.  <u>See</u> www.drugs.com/glipizide.html (last visited Sept. 12, 2019).  Lisinopril is an ACE inhibitor used to treat hypertension.  <u>See</u> http://www.drugs.com/lisinopril.html (last visited Sept. 12, 2019).  NovoLog (generic insulin) is used to improve blood sugar in people with diabetes mellitus.  <u>See</u> http://www.drugs.com/novolog.html (last visited Sept. 12, 2019).  Omeprazole is a proton pump inhibitor used to treat GERD by decreasing the amount of acid produced in the stomach.  <u>See</u> http://www.drugs.com/omeprazole.html (last visited Sept. 12, 2019).   Simvastatin (marketed as Zocor) is used to lower cholesterol and triglycerides in the blood.  <u>See</u> http://www.drugs.com/simvastin.html (last visited Sept. 12, 2019).

On September 22, 2014, Plaintiff sought treatment at St. Luke's Hospital emergency room for a burning sensation and pain in her bilateral feet and legs which had been progressively worsening for three days. Tr. at 314. Plaintiff indicated that she was unable to afford her diabetic medications and had not taken them for a month. Id. She ambulated on her heels due to foot pain, her bilateral feet and calves were tender to touch, and proprioception of the big toes was absent,[7] and her neurological exam was otherwise normal with intact cranial nerves, reflexes, gait, strength, and sensation. Id. at 316. The attending physician opined that Plaintiff's pain was secondary to diabetic neuropathy, and discharged her with a prescription for a glucose meter and strips so that she could monitor her glucose at home. Id.

On October 31, 2014, Plaintiff returned to the St. Luke's emergency department with complaints of worsening lower back pain that radiated into her right leg. Tr. at 325. Plaintiff indicated that she was unable to receive medications and follow-up care due to a lack of insurance. Id. at 332. Plaintiff could not ambulate normally due to radiating pain, and a straight-leg test was positive. Id. at 326, 327.[8] She had normal pedal pulses and good lower extremity strength. Id. at 326. Plaintiff was discharged with diagnoses of chronic back pain and sciatica. Id. at 330-31.

---

[7]Proprioception refers to the function of sensory nerves. DIMD at 1528.

[8]Straight-leg test is performed to determine whether a patient with low back pain has an underlying herniated disc, and the test is positive if pain is produced upon lifting a straight leg between thirty and seventy degrees. Johnson v. Colvin, Civ. No. 09-2228, 2014 WL 7408699, at *5 n.17 (M.D. Pa. Dec. 30, 2014).

On November 20, 2014, Plaintiff returned to St. Luke's for an outpatient clinic follow-up.  Tr. at 304-08.  Plaintiff reported that her sciatica was progressively getting worse, she had a left foot wound attributed to diabetic neuropathy, and she was not taking her diabetic medication due to financial constraints.  Id. at 304.  She exhibited decreased bilateral reflexes and sensation in her feet.  Id. at 307.  The physician discontinued glipizide, metformin, and NovoLog, and started Plaintiff on Novolin R for diabetes, gabapentin for peripheral neuropathy, and tramadol for sciatica.  Id. at 304.[9]  Four days later, Plaintiff sought emergency treatment for blisters on the toes of her left foot, with complaints of chronic neuropathy and ongoing sciatica which caused her to favor her left side when ambulating.  Id. at 335-37.

On January 12, 2015, Plaintiff returned to the emergency department again for worsening leg pain.  Tr. at 770-73, 1036-52.  She stated that she had been unable to see her primary care provider because she lost her insurance.  Id.  During a visit to Bethlehem Family Practice three days later, Plaintiff complained of back pain radiating into her pelvis and right leg.  Id. at 1670.  At a follow-up on January 23, 2015, she was prescribed Lidoderm patch, Norco5, and gabapentin.  Id. at 1658.[10]

---

[9]Metformin is a diabetes medicine.  See http://www.drugs.com/metformin.html (last visited Spt. 12, 2019).  Novolin R is insulin for diabetes.  See http://www.drugs.com/cdi/novolin-r.html (last visited Sept. 12, 2019).  Gabapentin is used to treat nerve pain.  http://www.drugs.com/gabapentin.html (last visited Sept. 12, 2019).  Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.  See https://www.drugs.com/tramdol.html (last visited Sept. 12, 2019).

[10]Lidoderm (generic lidocaine) is used to stop pain.  See http://www.drugs.com/cdi/lidoderm.html (last visited Sept. 12, 2019).  Norco5 is a

On February 5, 2015, Irene Cherfas, M.D., performed an ophthalmologic consultative examination. Tr. at 354-55. Dr. Cherfas diagnosed diabetic retinopathy in both eyes, and noted that Plaintiff had cataracts in both eyes which required no intervention. Id. at 354. In a further notation dated February 10, 2015, Dr. Cherfas opined that Plaintiff's visual acuity did not render her legally blind or prohibit her from driving, and that she was employable from a visual perspective. Id.[11]

On February 12, 2015, Plaintiff received treatment from Gregory Bentzinger, D.P.M., a podiatrist, for complaints of difficulty walking due to diabetic foot complications. Tr. at 427-28. He removed a callus, and on examination found weakened pulses and decreased sensation to pressure, touch, and vibration. Id. at 427. During follow-up appointments with Dr. Bentzinger in February and March 2015, Plaintiff continued to report pain on ambulation. Id. at 425, 426. The doctor provided Plaintiff diabetic insoles on February 26, 2015, and instructed her to wear them at all times, id. at 426, and the following month he casted her for custom orthotics. Id. at 424.

On February 20, 2015, David Hutz, M.D., reviewed medical records to assess Plaintiff's physical impairments as part of the Agency's initial disability determinations. Tr. at 72-81. Dr. Hutz considered Plaintiff's diabetes mellitus and peripheral neuropathy

---

combination of acetaminophen and hydrocodone, an opioid pain medication. http://www.drugs.com/norco.html (last visited Sept. 12, 2019).

[11]The record contains significant treatment for vision-related complications of diabetes, including bilateral diabetic macular edema, retinal hemorrhage, proliferative diabetic retinopathy, vitreous separation, and nuclear sclerosis, primarily under the care of Andrew Kimmel, M.D. Tr. at 256-272, 432-535. However, Plaintiff's claims focus primarily on limitations caused by her peripheral neuropathy.

to be severe conditions, and her hypertension and other disorders of the nervous system to be non-severe.  Id. at 76.  The doctor opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and stand and/or walk and sit for about six hours each in an eight-hour workday, with limited ability to push and/or pull with her lower extremities.  Id. at 77-78.  Dr. Hutz further opined that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders/ropes/scaffolds.  Id. at 78.  Plaintiff must also avoid concentrated exposure to extreme cold, extreme heat, and hazards such as machinery and heights.  Id. at 78-79.  Dr. Hutz concluded that Plaintiff could perform light work and was therefore not disabled. Id. at 80.

On April 17, 2015, an MRI of Plaintiff's lumbar spine revealed an "[a]nnular bulge and hypertrophic facet degenerative change at L5-S1 resulting in moderate to severe biforaminal stenosis with questionable impingement upon exiting L5 nerve roots bilaterally."  Tr. at 730.  On May 4, 2015, a nerve conduction study of Plaintiff's lower extremity revealed electro-diagnostic evidence of peripheral neuropathy and radiculopathy with "active signs of denervation."  Id. at 806.  On May 28, 2015, a brain MRI performed in response to complaints of headaches, dizziness, and right-sided numbness revealed "[p]artial agenesis of the posterior aspect of the corpus callosum with a lipoma seen anterior to and above the callosum," which is "a developmental/congenital abnormality."  Id. at 785-86.[12]

_____

[12]Agenesis is the absence of an organ.  DIMD at 37.  The corpus callosum is an arched mass of white matter consisting primarily of transverse fibers connecting the

On July 9, 2015, Hasrshini Dani, M.D., of St. Luke's Spine & Pain Associates, saw Plaintiff for a chief complaint of low back pain which radiated to her feet. Tr. at 724-31. Dr. Dani noted that Plaintiff's right radicular symptoms correlated with her MRI findings. Id. at 724. Plaintiff reported moderate relief with physical therapy, and no relief with heat and ice. Id. at 725. Upon examination, she exhibited tenderness to palpitation in the right lumbar and sacroiliac region, positive straight leg raise, and positive Patrick's and Gaenslen's signs on the right. Id. at 729-30.[13] Dr. Dani instructed Plaintiff to continue with medications and physical therapy. Id. On July 16, 2015, Dr. Dani performed an L4-L5 transforaminal epidural steroid injection. Id. at 707.

On July 23, 2015, Plaintiff presented to Dr. Bentzinger after breaking her right big toe, which had been confirmed the previous day by x-rays taken at St. Luke's emergency room. Tr. at 423, 965, 968.[14] Dr. Bentzinger noted that Plaintiff's pain worsened upon activity and upon pressure applied when walking, and that she exhibited weakened pulses and edema. Id. at 424. The doctor taped two toes together, provided her with surgical shoes to wear at all times, and gave her a note to stay out of work for eight weeks. Id. at

---

cerebral hemispheres of the brain. Id. at 417. A lipoma is "a benign, soft, rubbery encapsulated tumor of adipose tissue, usually composed of mature fat cells." Id. at 1063.

[13]A positive Patrick's sign indicates arthritis of the hip. DIMD at 1896. A positive Gaenslen's sign indicates lumbosacral disease. Id. at 1711.

[14]Cervical spine testing performed during this hospital visit revealed mild cervical spondylitis, and left-sided degenerative changes and mild left-sided foraminal narrowing at C4-5. Tr. at 1029.

423.[15]  Four days later, Plaintiff appeared at South Bethlehem Family Practice for a follow-up from her two most recent emergency room visits.  Id. at 733-38.  Plaintiff was advised that she had broken her narcotic agreement because she filled pain medications from two different providers, and was referred to pain management for further assessment and management of her chronic pain.  Id. at 733, 737.

 On October 29, 2015, Dr. Bentzinger ordered a TENS unit to increase bone healing in Plaintiff's broken big toe, tr. at 417,[16] but this was discontinued in December 2015 because Plaintiff reported that it made the pain worse.  Id. at 415-16.  On January 14, 2016, Dr. Bentzinger instructed Plaintiff to stay off work for another four weeks because her right toe remained broken and her condition had not improved.  Id. at 413-14.  At Plaintiff's next visit, on February 4, 2016, the doctor authorized Plaintiff to return to work "part time (3 days per week 8 hours)."  Id. at 412.

On July 4, 2016, Plaintiff returned to St. Luke's emergency department for severe back pain.  Tr. at 951.  Upon examination, Plaintiff exhibited tenderness, pain, and spasm of her lumbar back, with normal range of motion, and normal coordination and gait.  Id. at 953.  Plaintiff was discharged with improved but persistent pain, and was instructed to follow up with her primary care provider, Deborah Ramanathan, M.D.  Id. at 955.

---

[15]As will be discussed, Plaintiff returned to part-time work at Walmart for a couple of months in 2015, until she broke her toe in July, and returned again in 2016 for several months until she experienced foot wounds.  Tr. at 40.

[16]TENS is the acronym for transcutaneous electrical nerve stimulation, which is used in the treatment of pain.  DIMD at 1882.

Between July 6 and October 20, 2016, Plaintiff treated with Matthew Suter Azzatori, D.C., a chiropractor, who performed several adjustments.  Tr. at 392-402.

During follow-up visits with Dr. Ramanathan in 2016, Plaintiff continued to report back and foot pain.  For example, on August 4, 2016, the doctor noted that Plaintiff was in tears when she presented with foot pain that radiated up to the calf, and a worsening ulcer on the bottom of her foot.  Tr. at 1573.  Dr. Ramanathan told Plaintiff that she should could not return to work, indicating on a Return to Work/School form that she "is unable to stand, walk or put any pressure on that toe to avoid further injuries."  Id. at 1572.  On August 9, 2016, x-rays revealed mild erosive arthropathy at various left toe joints.  Id. at 1471.[17]  In August 2016, Dr. Ramanathan referred Plaintiff for home nursing services.  Id. at 624.  Plaintiff then received skilled care visitation by a physical therapist and skilled nurse to assist in wound care, pain and depression management, balance training, gait with assistive device, and diabetic care instruction.  Id. at 537-38.

On September 6, 2019, Dr. Ramanathan noted Plaintiff's complaint of intense pain that shot up her left foot to her ankle, and that over-compensation with her right foot had begun to cause right-sided pain.  Tr. at 1557.  The doctor noted that Plaintiff had seen a wound specialist for her left big toe, which had been debrided three times.  Id.  When Plaintiff returned to Dr. Bentzinger two days later, the doctor noted that Plaintiff's foot ulcer remained present, and that edema and erythema were present on the left foot and

---

[17]Arthropathy is any joint disease.  DIMD at 158.

left toe.  Id. at 407.[18]  The podiatrist again casted Plaintiff for custom orthotics.  Id. at
406.

On October 6, 2016, Dr. Ramanathan completed a Medical Source Statement of
Ability to Do Work-Related Activities (Physical).  Tr. at 389-90.  The doctor indicated
that she sees Plaintiff once per month, usually for an hour.  Id. at 389.  Dr. Ramanathan
listed Plaintiff's diagnoses as diabetes, arthropathy of the left big toe and other toe joints,
neuropathy, and back pain, and did not indicate a prognosis.  Id.  The doctor opined that
Plaintiff could sit for zero to two hours and stand/walk for one hour in an eight-hour
workday, that she needed to alternate between sitting and standing every half-hour, and
that she required a cane to ambulate.  Id.  Dr. Ramanathan indicated that Plaintiff could
occasionally lift/carry ten pounds and never lift twenty or more pounds, frequently push
and/or pull with her upper and lower extremities, occasionally climb stairs, rarely kneel
or crouch, and never climb, bend/stoop or balance.  Id.  Plaintiff could frequently reach in
all directions, including overhead, and handle objects, but could rarely finger or feel.  Id.
at 390.  Dr. Ramanathan indicated that Plaintiff is limited in her ability to see, hear, and
speak, explaining that she has macular degeneration.  Id.  She should avoid temperature
extremes, humidity, and hazards.  Id.  Regarding accommodations, Dr. Ramanathan
opined that Plaintiff would require unscheduled breaks every fifteen minutes (with no
duration indicated) and walking breaks every half an hour (lasting ten minutes each), and
that she needed to elevate her legs for ten minutes, three times per day -- thirty degrees

---

[18]Erythema is redness of the skin produced by congestion of the capillaries.
DIMD at 643.

for the right leg and ninety degrees for the left leg.  Id.[19]  The doctor did not indicate how often Plaintiff would likely be absent from work due to her impairments or treatment.  Id.

Dr. Bentzinger also completed Medical Source Statement of Ability to Do Work-Related Activities (Physical), which is undated.  Tr. at 403-04.  The doctor did not indicate a frequency or length of contact with Plaintiff, did not list her diagnoses or symptoms, and did not provide a prognosis.  Id. at 403.  Dr. Bentzinger indicated that Plaintiff could sit for zero to two hours and stand/walk for three hours in an eight-hour workday, did not need to periodically alternate between sitting and standing, and required a cane to ambulate.  Id. at 403.  Plaintiff could lift up to ten pounds frequently, twenty pounds occasionally, and twenty-five pounds rarely, could frequently lift and/or pull with her upper extremities and occasionally with her lower extremities, could occasionally perform all postural limitations, and could frequently reach, handle, finger, and feel.  Id. at 403-04.  Dr. Bentzinger did not indicate the presence of visual/communicative or environmental limitations, but did identify the need for unscheduled breaks every two hours lasting ten minutes each.  Id. at 404.  The doctor opined that Plaintiff would likely be absent from work for one day per month.  Id.

---

[19]There is some ambiguity in how the doctor completed the form, specifically whether the doctor's indication of "3 times a day" for "10 minutes" refers to Plaintiff's need for bathroom breaks or for leg elevation.  Tr. at 390.  I defer to the ALJ's reasonable interpretation of the form as referring to frequency and duration in conjunction of leg elevation.  Id. at 26.

## C.    Other Evidence

Plaintiff reported that she stopped working in a nursing home in approximately July 2014 due to her disabling conditions.  <u>Tr.</u> at 183-84, 210.  At her administrative hearing, she testified that she worked at Walmart for two or three months in 2015, that they put her on light-lifting stock duty, and that she stopped working after her complaints of throbbing pain led to an x-ray and the discovery that she had a broken big toe.  <u>Id.</u> at 43, 48.  In 2016, Plaintiff was medically cleared to return to work part-time for six weeks, three days per week, and then resumed full-time, <u>id.</u> at 56, but she had difficulty with bending, lifting, and walking, and she stopped working after several months when she discovered a painful callus.  <u>Id.</u> at 44-46.  Plaintiff testified that her doctor will clear her to return to part-time work once she finishes physical therapy, <u>id.</u> at 57, and that she intends to return to full-time work, depending on how she does while working part-time. <u>Id.</u> at 70.  Plaintiff's counsel noted that Plaintiff worked less than six months in each of the two prior years due to her conditions, stating, "it appears that when [Plaintiff's] feet are uninjured, she's capable of performing work.  It also appears that her condition keeps her from performing work on a consistent and sustained basis."  <u>Id.</u> at 41.

Plaintiff testified that in early 2015, before she broke her big toe, she could walk twelve to fifteen feet without pain, and about twenty to twenty-five feet in total before she had to stop.  <u>Tr.</u> at 44, 49-50.  She started ambulating with a cane three weeks prior to the hearing.  <u>Id.</u> at 44.  Her vision is constantly blurry, including with glasses, and it gets better or worse depending on her blood sugar level.  <u>Id.</u> at 52.  The loss of sensation in her feet now also occurs in her hands, where she feels a constant tingle.  <u>Id.</u> at 60.  She

can drive short distances during the daytime, such as ten minutes to the store, and gets driven to work by her husband or son. Id. at 53. She has no medication side-effects, including no fatigue. Id. at 61, 207.

When asked to describe a typical day, Plaintiff stated that she mostly keeps her feet elevated while on a couch, and that she needs to start moving after half an hour to fort-five minutes due to back pain -- a process she repeats five or six time per day. Tr. at 48. She can take care of her personal needs such as dressing and bathing, but stated that chores such as cooking, cleaning, and laundry are performed by her adult daughters when they visit. Id. at 49. Plaintiff's testimony is largely consistent with her function report (id. at 199-206), a third-party function report completed by Plaintiff's mother (id. at 191-98), and supplemental function questionnaires (id. at 207, 208-09), except that the reports indicate that she "daily" prepares simple meals such as sandwiches, tacos, and salads, and that she performs household chores such as dishes and laundry, but that it takes longer due to pain. Id. at 193, 201.

The VE testified that Plaintiff's past relevant work as a store laborer is unskilled and medium -- although performed most recently as light following a broken toe -- and her work as a nurse aide is semi-skilled and medium. Tr. at 63. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who can lift twenty pounds occasionally and ten pounds frequently; sit, stand and walk six hours each in an eight-hour day; occasionally use lower extremities for pushing and pulling or foot controls, perform postural maneuvers, and take ramps and stairs; and who must avoid unprotected heights and climbing ladders, ropes, and scaffolds. Id. at 63-64.

The VE testified that such a person could perform Plaintiff's past relevant work as a store laborer.  Id. at 64.  The VE further testified that there were light-level jobs such a person could perform, such as small product assembly, inspection, and garment folder.  Id. at 65. None of the identified jobs would be affected if the hypothetical individual could only read book-sized print or smaller on an occasional basis, but they could not be performed on a full-time basis if the person were restricted to standing and walking four hours in an eight-hour day.  Id. at 66.  In response to questions from Plaintiff's counsel, the VE testified that if a person were limited to working only six to eight months per year, such a person could not engage in full-time, non-seasonal employment.  Id. at 68-69.

### D.     Consideration of Plaintiff's Claims

#### 1.     Opinions of Drs. Ramanathan and Bentzinger

Plaintiff argues the ALJ's decision is not supported by substantial evidence because the ALJ improperly rejected the opinions of Drs. Ramanathan and Bentzinger. Doc. 9 at 15-19.  Defendant counters that this aspect of the ALJ's determination is supported by substantial evidence.  Doc. 10 at 7-11.

A treating physician's opinion is entitled to controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).[20]  When a treating physician's opinion is not accorded controlling

---

[20]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's application was filed

weight, the ALJ should consider a number of factors in determining how much weight to

give it; the examining relationship (more weight accorded to an examining source), the

treatment relationship (including length and nature of the treatment relationship),

supportability, consistency, specialization, and other factors. Id. § 404.1527(c)(1)-(6).

"Generally, the more consistent a medical opinion is with the record as a whole, the more

weight we will give to that medical opinion." Id. § 404.1527(c)(4).

In discussing the opinion evidence of record, the ALJ stated the following:

> Deborah Ramanathan, M.D. noted in October 2016 that
> [Plaintiff] had diabetes, neuropathy, back pain, and
> arthropathy in the left side and that she walked slowly with a
> cane, as she had to rely on her left leg. She opined
> [Plaintiff's] conditions affected sitting more than two hours
> and standing/walking over one hour. The examiner further
> opined [Plaintiff] needed to alternate sitting and standing
> every half hour and that she medically required a cane. Dr.
> Ramanathan also opined [Plaintiff] could occasionally lift 10
> pounds and never any weight over that amount. . . . The
> examiner opined [Plaintiff] had trouble seeing, hearing, and
> speaking due to macular degeneration; should avoid
> temperature extremes, humidity, wetness, and hazards
> (machinery and heights); would need unscheduled breaks
> every 15 minutes; would need walking breaks every half hour
> for 10 minutes; three times a day would need to raise her right
> left to 30 degrees and left leg to 90 degrees.
>
> The undersigned did not grant significant weight to Dr.
> Ramanathan's assessment of [Plaintiff's] ability to perform
> basic work activities. Although the examiner enjoyed the
> advantage of an in-person evaluation as opposed to the non-
> examining assessment completed by the state agency
> examiners, the undersigned finds these limitations are poorly
> supported and contrary to the weight of the evidence.

prior to the effective date of the new regulations, the opinion-weighing paradigm is
applicable.

Dr. Gary Bentzinger opined [Plaintiff] could sit less than two hours; stand/walk three hours; and needed to sit and stand at will as well as use a cane. The examiner further found [Plaintiff] could lift no more than 10 to 20 pounds occasionally and 25 pounds rarely; frequently use the upper extremities and occasionally use the lower extremities for pushing and pulling; occasionally climb, bend, stoop, balance, and kneel; frequently reach in all directions and handle, finger, and feel; would need to take unscheduled breaks of 10 minutes every two hours; and would miss one day of work a month.

In this case there is a lack of objective or laboratory findings to support the degree of limitation that Dr. Bentzinger finds. The medical record reveals no significant evidence of neurologic compromise which would affect [Plaintiff's] ability to stand, walk, or sit to the degree indicated; he does not relate his opinion as to any specific findings; his opinion is not supported by reports, which indicate only routine outpatient care, with little or no continuing treatment or use of prescribed medication; and his assessment is inconsistent with [Plaintiff's] self-reported activities of daily living. The undersigned, therefore, gives little weight to Dr. Bentzinger's assessment of [Plaintiff's] [ RFC].

. . . .

The opinion of the expert who prepared the State Agency (DDS) report is given great weight. The expert's opinion is balanced, objective, and consistent with the evidence of record as a whole. Although this expert did not have an opportunity to examine or treat [Plaintiff], the report clearly reflects a thorough review of the record and is supportable. In short, this expert's familiarity with the . . . disability evaluation program and the evidence of record warrants the greatest weight – the opinions given the greatest weight are most consistent with the longitudinal review of the evidence of record.

Tr. at 25-26 (record citations omitted).

I find that the ALJ's consideration of the medical opinion evidence is flawed for several reasons. First, of the three record medical opinions and functional reports, the ALJ gave "greatest weight" to Dr. Hutz who was the only physician who never saw Plaintiff, while giving little weight to the opinions of Plaintiff's longtime treating physician, Dr. Ramanathan, and to her treating podiatrist, Dr. Bentzinger. While the ALJ acknowledged that Dr. Ramanathan in particular "enjoyed the advantage of an in-person evaluation as opposed to the non-examining assessment completed by the state agency examiners," tr. at 26, the ALJ did not mention that the doctor treated Plaintiff once per month, usually for an hour, id. at 389, or that her opinions regarding Plaintiff's limitations were accompanied by explanations. Notably, the record does not contain any opinion evidence from a treating physician that conflicts with the RFC assessments made by Drs. Ramanathan and Bentzinger.

A second and related flaw is that the Dr. Hutz performed his non-examining assessment of Plaintiff first in time, on February 20, 2015, whereas Dr. Ramanathan completed her medical source statement on October 6, 2016, and Dr. Bentzinger's assessment, while undated, likely fits in the same timeframe given the doctor's treatment of Plaintiff's foot wounds during 2016. Id. at 412. Similarly, the ALJ's explanation that she gave the "greatest weight" to the non-examining reviewer because his "report clearly reflects a thorough review of the record," id. at 26, cannot be squared with the fact that Dr. Hutz's opinions were rendered without the benefit of Plaintiff's two failed attempts to return to work, in 2015 and 2016, and later diagnostic testing and treatment history which supports far greater limitations than those Dr. Hutz found. These diagnostic tests include

a lumbar spine MRI which revealed degenerative changes at L5-S1 "resulting in moderate to severe biforaminal stenosis with questionable impingement upon existing L5 nerve roots bilaterally," id. at 730 (4/17/15); a brain MRI performed in response to complaints of headaches, dizziness, and right-sided numbness which revealed a developmental/congenital abnormality, id. at 785-86 (5/28/15); Dr. Dani's statement that Plaintiff's right radicular symptoms correlated with her MRI findings, as well as positive straight-leg raise and Patrick's and Gaenslen's signs, id. at 724, 729-30 (7/09/15); and x-rays showing arthropathy of Plaintiff's toe joints, id. at 1471 (8/9/16). During this period, Plaintiff's treatments included regularly prescribed diabetic and pain medication, physical therapy, spinal injections, chiropractic adjustments, surgical shoes and custom-casted orthotics, a prescribed cane to assist in walking, and in-home nursing care. Therefore, although the ALJ credited Dr. Hutz with a "thorough review of the record," the medical evidence available to him at the time of his review hardly presented a full picture of Plaintiff's medical condition and treatment history during the relevant period.

Third, the ALJ based her rejection of the treating physicians' opinions partly on incorrect statements, and partly for improper reasons. For example, in discussing Dr. Bentzinger's assessment, the ALJ stated that "[t]he medical record reveals no significant evidence of neurologic compromise which would affect [Plaintiff's] ability to stand, walk, or sit to the degree indicated," and "little or no continuing treatment or use of prescribed medication." Tr. at 26. These statements are inaccurate, as demonstrated by diagnostic testing and lengthy treatment outlined above. Elsewhere, the ALJ improperly relied on her own credibility judgments, speculation or lay opinion. See Morales v.

Apfel, 225 F.3d 310, 317 (3d Cir. 2000) ("An ALJ . . . may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion.") (quoting Plummer v. Apfel, 186 F.3d 422, 439 (3d Cir. 1999)).  For example, the ALJ noted Plaintiff's statement that lack of insurance and financial constraints have limited her ability to remain compliant with her diabetic medication but not her pain medication, and then stated that "[i]t would appear an individual experiencing the pain and debilitating limitations that she alleges[] would have found some way to obtain medical treatment and medication," tr. at 25, without acknowledging that Plaintiff repeatedly went to emergency rooms for precisely those reasons.  In discussing Plaintiff's testimony regarding her limitations, the ALJ stated that Plaintiff's examinations did not reveal certain symptoms "which are often associated with long-standing, severe, or intense pain and physical inactivity," id., without referencing any medical opinion to that effect.  In any event, despite instances of insurance-related non-compliance, Plaintiff received almost constant treatment for observable and diagnostically-validated back, leg and foot pain, and multiple medical providers prescribed medications and various forms of treatment, with no indication that any such medication or treatment was considered to be inadvisable or unnecessary.

Finally, the ALJ's statement that the opinions of Drs. Ramanathan and Bentzinger are inconsistent with the medical record is flawed.  As previously noted, Plaintiff has received almost continuous treatment for back and lower extremity pain and symptoms which are confirmed by diagnostic testing.  Defendant relies on five instances in which

the treating physicians found limitations greater than those indicated in Plaintiff's medical records.  See Doc. 10 at 9.  It is notable that there are only five instances cherry-picked from a three-volume administrative record containing 1,814 pages.  More importantly, four of the five cited instances are from 2014 and early 2015 -- before Plaintiff twice attempted to return to work, and before diagnostic testing confirmed the presence and extent of her neuropathy and other impairments.  Finally, as previously noted, no treating medical source opined that Plaintiff was less limited than the assessments made by Drs. Ramanathan and Bentzinger.

For all of the aforementioned reasons, I will remand this matter for further development of the record, including additional consultative and/or treating opinion evidence regarding Plaintiff's condition and limitations prior to her date last insured.

### 2.     Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly discounted Plaintiff's subjective complaints.  Doc. 9 at 19-23.  Defendant counters that the ALJ's evaluation of Plaintiff's subjective complaints is supported by substantial evidence.  Doc. 10 at 11-13.

In her opinion, the ALJ properly engaged in a two-step evaluation of Plaintiff's subjective symptoms, finding first that there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, and second that the intensity, persistence and limiting effects of the symptoms were not entirely consistent with the medical and other evidence of record.  Tr. at 24. Because I remand for further development of the record -- and because such further

development could change the ALJ's assessment of Plaintiff's subjective complaints -- I need not address this claim further.

> ### 3.   Duty to Develop the Record

Lastly, Plaintiff argues that the ALJ failed to fully develop the record. Doc. 9 at 22-23. Because I remand for further development of the record, it is not necessary to address this claim. However, Defendant's argument that Plaintiff failed to proffer what evidence could have been adduced that might have changed the outcome, see Doc. 10 at 14 (citing an unpublished Fourth Circuit table decision), warrants comment. As previously noted, Plaintiff bears the burden with respect to the existence and limiting effects of impairments supported by the record, see Poulos, 474 F.3d at 92, and in addressing the ALJ's decision not to fully credit Plaintiff's treating physicians, Plaintiff argues that the ALJ could have, among other things, re-contacted any of the treating physicians for clarification, arranged for a consultative examination, or scheduled a review of the record and testimony by a medical expert. See Doc. 9 at 22-23. These options are available to an ALJ if the existing evidence is incomplete or inconsistent, see 20 C.F.R. § 404.1520b, and if so, courts in this jurisdiction have not imposed a further obligation on Plaintiff to identify with specificity what records or physician statements would be obtained that might have changed the outcome.

## V.   **CONCLUSION**

The ALJ's consideration of the medical opinion evidence is flawed, necessitating remand for further proceedings consistent with this opinion. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARITZA RODRIGUEZ      :     CIVIL ACTION
                              :
         v.                     :
                              :
ANDREW SAUL, Commissioner of    :     NO. 18-1908
Social Security                       :

# O R D E R

AND NOW, this 25th  day of September 2019, upon consideration of Plaintiff's

request for review (Doc. 9), the response (Doc. 10), and after careful consideration of the

administrative record (Doc. 8), IT IS HEREBY ORDERED that:

1.     Judgment is entered REVERSING the decision of the Commissioner of Social Security for the purposes of this remand only and the relief sought by Plaintiff is GRANTED to the extent that the matter is REMANDED for further proceedings consistent with the attached Memorandum; and

2.     The clerk of Court is hereby directed to mark this case closed.

                             BY THE COURT:

                             /s/ELIZABETH T. HEY

                             _____

                             ELIZABETH T. HEY, U.S.M.J.